All rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court of the 2nd District is open for assent to adjourn. The Honorable Michael J. Burke is present. Please be seated. I rise to give the case of the morning call 213-0359 in the manner of George W. Munoz v. Gary Pritchett on behalf of Mrs. Munoz, Mr. George Acosta, on behalf of Mrs. Pritchett and Ms. Kathleen Rosa.      and Ms. Kathleen Rosa. Thank you. Good morning, Justices. My name is George Acosta. I represent the petitioner in this case, the Appellate, Gregory Munoz. And by extension also, I represent his wife, Christine, and his minor son, Gregory, Jr., both of whom would be afforded protections under the order that was originally required.        Gary Pritchett and Ms. Kathleen Rosa. from the trial court. I'm going to be addressing three main issues raised in this appeal. First and foremost is why the trial court's denial of the petition for a plenary stalking or contact order requires reversal, because the trial court impermissibly applied a more restrictive and subjective standard of what type of behavior constitutes stalking than does the plain language of the act itself. What's the standard of review on that issue? It's de novo. Why is that? We're talking about construction of a statute, and interpreting statutory language is de novo. Well, we're talking about the court's interpretation of the facts and application of the law to the facts. Not really, Justice. With respect, what we have here is a trial court that substituted a separate standard and definition of what constitutes stalking than what the act requires. It wasn't just an assessment of the factual circumstances. As indicated in her ruling, she regularly, the trial court regularly substituted its own standard for what the statutory language requires. She said repeatedly, I don't think this constitutes stalking. I don't think this amounts to definition. She did go, she talked about her past experience with some other cases. Yes, she did. She then went back to the act and said, I don't find that there's any stalking here. Let me ask you this question. Yes. You say in your brief, page 37, many specific examples of statutory defined acts of stalking, but there's no citation to the record as to where those examples are. You then go on to list a laundry list, one of which is, for example, leaving grass clippings from leaving a newspaper article. Are those covered by the act? Leaving grass clippings? They absolutely are. It constitutes vandalism, and it's part of the definition of what conduct constitutes stalking. Is vandalism among the laundry list of? Yes, it is. Yes, it is. Under Section 5, Purpose, stalking generally refers to a course of conduct, not a single act. Stalking behavior includes, and I'm condensing this, following a person, surveillance, appearing at the person's home, work, or school, unwanted phone calls, leaving objects for the person, vandalizing the person's property. That's in Section 5. Leaving grass clippings is vandalizing. Leaving grass clippings on the property is vandalizing the property. Is there any allegation that there was damage to the property? Well, it's leaving debris on it, and that's what we believe constitutes vandalism. So the grass clippings, any others? There was also an article left on the mailbox with various words underlined in the article, including the word death or dead. And that was left anonymously for them at the time, although it was subsequently admitted that the respondent did that. Didn't the trial court also look at the acts of the petitioner to basically separate aside from this definition of stalking? I mean, even if you assume that there was stalking involved from one side, I mean, the trial court seemed to look at the basis that both of these parties are complicit in this. And why was that error? We believe it was error because there's nothing in the act that justifies or defends stalking on the part of the respondent, irrespective of what the petitioner may or may not have done. The act specifically suggests that if there are grounds for the claim of bad conduct or stalking on the part of the petitioner, that the respondent is to file a separate action. That's part of the act itself. It seems like an extremely inefficient way to handle a case. So what you're saying is in a situation like this, that if you have two parties who are clearly, and I know you're arguing that that's not the case here, but let's say you have two parties who are clearly battling each other and both clearly at fault, and one races to the courthouse first, and then that person has a hearing on their order of protection, for lack of a better term. What the other party did is irrelevant to that proceeding. And then that party would then have to file their own petition, and then what the other party did would be irrelevant to that proceeding. It just seems like a, it doesn't seem like it would be the way that we would efficiently handle this case. So we'd have two basically competing orders at the same time. I don't know that they'd be competing, and I agree with you that it would be somewhat inefficient, but that's how the act is drafted. But don't we have to give some logic and meaning to the act? I mean, we can't apply it and come up with an absurd result. No, but there's nothing illogical about applying it in this fashion. What it does is it narrows the scope of what's at issue in the original hearing. You're looking at the respondent's behavior. And I think part of the legislative background on this is they didn't want people to just stand up and defend themselves by saying, no, he did it first, because now you've got a circus. Well, but you have bad behavior on both, if you have bad behavior on both sides, as Justice Burke said, what would preclude one from getting to the courthouse first? I mean, how about unclean hands? Yeah, unclean hands is obviously a potential defense in an equitable proceeding. This is a statutory proceeding. It has nothing to do with a formal defense of this conduct. What the act is getting at is it's trying to prohibit and prevent misconduct of the type that's statutorily defined. So leaving things, vandalizing, unwanted contact, especially where in a case like this where the petitioner has specifically requested a police officer numerous times, leave me alone, I just want to be left alone and my family left alone by this man. So it narrows the scope of whether this respondent's behavior has met that standard. Now, again, if there is competing allegations that a petitioner has done the same thing, you can have a narrow scope hearing under the same act in a separate proceeding. But there's nothing here that defends or excuses what the legislature is seeking to prohibit. Well, the court, the trial court, made a finding that the acts that were alleged just didn't meet the threshold requirement of showing acts of stalking. That's correct. You know, we've gone back over this. Your interpretation of menacing with the newspaper article was underlining words that were in the article, highlighting words in a newspaper article. Selectively highlighting certain words. Well, whether it's selectively or not, the threat was the article, but it's a newspaper article. The issue regarding that conduct was that it was unwanted contact, and the act specifically refers to that. Whether it's leaving messages, texting, e-mails, surveillance, whatever it is, approaching or confronting him, those are all covered under the act. It's unwanted contact that is not excused and it's not welcomed by the petitioner. So that's what the act addresses. And essentially, Justice Burkett, it's the legislature saying we don't need to tolerate this in our civil society. We don't need to tolerate harassment and verbal abuse and unwanted contact because it does, under their definition, constitute stalking. Now, I will grant you that traditionally the idea of stalking, we may all have a picture of a young female person being followed, surveilled, et cetera, by an older man. That's not what the legislature is narrowly defining here. This is much broader, and the trial court initially on a 2615 motion to dismiss even said, I think that based on the pleadings, this is covered under the scope of this act. And she dismissed the respondent's initial 2615 motion on that basis. Ultimately, she did. Well, it's a different standard of review when your 2615 motion is supposed to be after trial. So you're mixing apples and oranges when you're talking about findings after a trial and comparing it to a ruling on a 2615 motion. The standards are different. The court's rationale is what I'm referring to, and the rationale at the end of the case was saying, no, this doesn't fit the definition of stalking, whereas initially she thought it did. Now, your issue with fees is tied to the issue, this issue that we just addressed. I mean, you do agree that if you don't prevail on the first issue, fees don't come in? Well, Justice, under Section 80, you're right. We need to prevail on the petition. But we had an alternate basis for seeking fees, too, and that had to do with the pleadings issues. We tried desperately to get the trial court to narrow the scope of the evidentiary hearing only to those issues that would have been factually contested. And unfortunately, the respondent was allowed to make a blanket denial under oath of all of the allegations, only to find out at the evidentiary hearing that he admitted seven or eight of those specific allegations. I submit to this court that if the court had required an item-by-item answer, and we know that in our court of civil procedure the Supreme Court rules apply in this procedure because the Act requires that, she could have narrowed it down, forced an answer, admitted perhaps some of those things that he admitted from the stand, and we could have resolved this case on the motions. Did you file a 137 motion? No, I did not file a 137. If he says in a pleading, I didn't do it, and he gets on the stand and says, I did it, why wouldn't you file a 137? I made reference to Supreme Court Rule 137, I believe, in my motion for fees, in addition to Supreme Court Rule 219, which the court found inapplicable for violations of court rules and court orders. And we felt that the respondent repeatedly violated court orders, not only in the restraining order, the temporary order. We did, and that was for repeatedly filing. Repeatedly filing the counterclaim, right? Yes, repeatedly filing a counterclaim that had been dismissed repeatedly. So this is a specific argument to the answer? Correct. Okay. Did you raise the applicability of 219 here on appeal? I'm not sure that we did, Justice Shostak, I'm not sure that we did. We certainly argued it in the trial court, and the court felt that it was not appropriate because it had to do with, she felt it had to do only with discovery. We felt it was broader than that and that it applied to court orders being violated during the course of proceedings. Can you explain to me the procedural posture of this petition for indirect criminal contempt? It seems to me, first of all, you raised it as an oral motion for criminal contempt during the evidentiary hearing, correct? Initially. And then the judge said, you've got to file a motion on this. I believe so, yes. And then you followed up with a motion. But then, all the evidence was done at the evidentiary hearing that applied to that petition? Well, we never got to any form of a hearing. Well, we had termed a rule to show cause, but as the court properly points out, it's a hearing on an indirect criminal contempt finding. We never had a hearing because the trial court cut us short and said that she had, quote-unquote, blown it by not giving him a constitutional rights admonishment. But wait, I mean, I looked at the transcript and I thought you and the trial court had agreed when Mr. Ewing came to the case, he was kind of befuddled as to what was going on. Yes. And he asked whether a rule had issued, again, we're talking, that's the wrong framework of this. Yes. But he asked if a rule had issued, and I believe both you and the trial court said, we did all the evidence on this already. We're just here for argument. That's true. That's true. Why are you saying now you were cut off and not able to present evidence? No, I'm sorry. I may have misspoke if you heard it. I didn't say we weren't able to present evidence. I'm saying that the court never conducted a formal hearing on the indirect criminal contempt charge, if you will. But nobody asked for a hearing, correct? That is correct. That is correct. I was proceeding under what I termed a rule of show cause. I did specifically cite in my motion that I was seeking an indirect criminal contempt finding against the respondent. Based on all of the evidence and the pleadings that were before the court, though? Yes. And we had testimony, both admissions from the respondent as well as an independent basis. Right. Exactly. And the court said, looking at all of that, I'm not going to find him because of her error, she said. Yeah. No, respectfully, she never came to a conclusion or a decision that he didn't, his conduct didn't meet the criteria. She never said that. She cut it short by saying, since I didn't admonish him, I can't consider his admissions and, therefore, I'm not going to enter the order. Isn't that tantamount to an acquittal, though? Well, it may be tantamount to it, but she did it, she never considered the additional testimony that was suffered on the part of an independent from his admissions, which she found to be in error. The United States Supreme Court has made it clear that even an error in the law that contributes to an acquittal cannot be jeopardy of taxes. You can't go back and retry the defendant. Well, Justice Burkett, this is not a formal criminal matter. This is a quasi-criminal matter, and I don't, my position would be that those types of criminal holdings don't necessarily apply because he was never put in jeopardy of being confined, for example. I think this is only a financial penalty. He was in jeopardy of punishment by contempt of court for either incarceration up to six months or a financial penalty. I don't think anybody was seeking incarceration. It doesn't matter. It's an affront to the court, and it's up to the court to determine what the penalty is. And the penalty, without a jury trial and without certain procedural safeguards, is up to six months in jail. So, I mean, even though you weren't asking for it in your petition, if the court finds that it was an affront to that court, you can certainly put him in jail for six months. Were there any such rulings by the court with respect to this? With respect to this, yes, there were. She stated on the record in her ruling that she found that the respondent had violated her temporary no-contact order, if I may contingent. So she stated that in her ruling, and then she trumped all of that by saying she blew it, she didn't give him any punishment. I think that there were reasonable alternatives that she could have followed after making that realization, conducted the hearing, either allowed him to testify again or considered the additional independent evidence testified to by the wife, Christine Munoz, and the son. So if we could reverse it and remand it, what would we be reversing remanding it for if she had already made that ruling? Well, my position would be that you would be reversing it and instructing the trial court to continue or finish that indirect criminal contempt hearing, perhaps independent of the respondent's own testimony and admissions, which she found to be made in error without her admonishments. And realistically, if the respondent did not stipulate to the earlier testimony, I mean, this could be a full-blown hearing from the start, right? I think it could be resolved on motions. I think that all we have to do is cite the testimony of Christine Munoz and Gregory Jr., which also support the finding that he violated that order on repeated occasions. That's already in the record. I realize that, but the petition wasn't filed. And when we're talking about indirect criminal contempt, there are due process safeguards, and one of those is notice. And he didn't get notice of what exactly you were talking about until he got that written petition. The evidence was long done by then. Well, when I cross-examined him on the stand, my purpose was to establish the grounds for my petition. It wasn't to try to – I don't know if we could find what that's notice. Notice to him of the charges he's facing for up to six months and up to $500. I think that can be done through the motion that I filed and explaining it to him. It doesn't have to be a full-blown evidentiary hearing. It's just a procedural thing at this point. You say in your brief that the order that the respondent allegedly violated was unauthorized. Correct? You say in your brief, and you argued, that the order that you are seeking indirect criminal contempt for was unauthorized by the act. How is it that you can claim he's in contempt of court for an order that's not authorized by the law? One of the issues is our position that the trial court essentially overstepped her bounds by entering that order. However, once entered, it required both parties to comply with it. There's no question about that. Well, in ruling on a contempt issue, doesn't the court have an obligation to look at the underlying order? If it were challenged by one of the parties at that hearing, yes. And we can affirm for any basis supported by the record, correct? You can, but that hasn't been supported by the record because nobody contested that at the time of the World Show cause. Well, I'm raising what you argued in your brief. You argued that the order was not authorized by the statute. I agree with that. All right, thank you, Mr. Anderson. You have time for one more argument. Thank you. As you all see, you may proceed. Good morning, Your Honor. My name is Kathleen Rosa, and I'm here on behalf of the appellee, Mr. Fritchie. I really, really don't know where to start. I've never done this before or so, and it's been a really long time since I've been in a courtroom. So I'll let you all know that. But I did not try this case. I simply read the record, which was difficult at best. And I don't believe that the court abused her discretion. I don't believe that the evidence really supported the entry of a stalking no-contact order. Wasn't it apparent by your client's admissions that he, in fact, was conducting himself consistent with the acts within the stalking statute? No, because I don't believe that the facts that my client admitted to rose to the level of stalking. What would you describe it as rising to the level of? Irritating. This was a case where, as the court said, these two people don't like each other. My client never threatened this man. He never – he certainly didn't surveil him. I don't believe at all that his conduct was anything more, really, than retaliatory, because when you're under surveillance 24 hours a day, seven days a week, which is all over this record, mainly admitted to by his – Mr. Acosta's clients, I think after a while, when your family is being surveilled and you're being surveilled and your neighbor walks around with a handheld camera and meets you at the mailbox repeatedly, I think after a while – His position is that he was protecting himself by surveilling your client. Well, Your Honor, if you're afraid to the point – I would submit to you – if you're afraid to the point where you feel you need to have someone else's freedom to move about affected, then I would dare say that taking an affirmative step to constantly approach that individual or to interact with that individual, whether you're driving down the street or getting your mail, I would argue, Your Honor, that if you're that afraid, you wouldn't keep to your home. And your argument is that that behavior is completely inconsistent with being afraid or suffering from severe distress. Oh, absolutely. Yes, sir, Your Honor, I do. I believe that – I believe, really, that Mr. Acosta's client – he didn't care for my client. It started in 2009 because Mr. Acosta's client put no trespassing signs at or near an easement. So the property belonged to Mr. Acosta's client, but it was an easement so that the public could traverse. That's the sense I got from the record. And the day after my client advised Mr. Acosta's client that his family use that easement to cross over to the baseball field, he put the no trespassing signs up. And then we have the – then we move into my client dumping the grass clippings, and then we move into the 13 serrated stakes that his client put up, and it just spirals from there. So it's a tit for tat. And if you look at the evidence, if you look at the video, I mean, the particular video that struck me the most was the mailbox because his client is practically running down his driveway. He's walking very quickly. Hurry, hurry, hurry. I have to get to this man that I'm terrified of so that I can videotape him, so I can prove to ostensibly you or a court that I'm afraid of this man. Does the stalking statute as set out here require that he be – he fear his life from this individual? No. It requires that he be – suffer significant mental suffering, anxiety, or alarm. I mean, that's what the emotional – I mean, he has to suffer emotional distress, and that's how the statute in Section 21-10 defines it. But it's one thing to suffer immense anxiety or alarm when someone has approached you. It's another thing to constantly put yourself in a situation, to go to the tortfeasor or the bad guy, and then say, oh, I'm afraid of you, but do something so that I can show everybody else how bad I think you are. I mean, the trial court and your argument now is focusing on what each party was doing toward each other. Counsel's argument, we're only really supposed to look at what the respondent did toward the petitioner. In your view of the record, what did the respondent admit to? I know there's some conflicting testimony, but there are certain things that your client admitted to doing, and the question then is whether that amounts to stalking. Right, and he did. He admitted – he admitted to a few things. He admitted that he dumped the grass clippings. Which could be seen as damaging or vandalism, correct? Well, I don't know how grass clippings would vandalize really anything and just make a mess, but if you actually looked at the picture of where he dumped the grass clippings, they were right in the area that had to, I'm presuming, was the – It hadn't been mowed. Pardon me? It hadn't been – No, right, it was all overgrown, so I'm presuming that was the area where the easement was. So it really didn't – it's not like he – he didn't dump them on the gentleman's front lawn. He put it in an area where, you know, a lot of people would perhaps, if there's a vacant lot next to your home, might cut your grass and put your own clippings in that lot, even though you don't own it, but perhaps that's what a lot of people do. I don't think that the neighbor should be then, you know, charged with stalking. No, the question is whether that was vandalism, because that's only one act that's alleged, and that's one thing that he admitted to. No. So the question is whether that's vandalism and whether if he had been charged, say, by ordinance violation with vandalism, vandalizing that person's property, whether that charge would have been sustained, and it likely would have been, would it not? I don't believe that that would be constitutional. Now, there are cases where people are TPing other people's houses where vandalism charges are sustained there. I mean, why is this any different? Because grass – well, first of all, I think you have to take a look at where they were dumped and the fact that they were dumped in an area that was not kept up anyway. So, I mean, arguably if that was his easement and the city failed to keep it up, although assuming they had an obligation to do that anyway, I mean, then that could be argued as vandalism. I mean, I don't think that – What else did he admit to? All right, he admitted to Christine Minos, who was the wife, that her husband was a wacko, and she responded by telling him to mind his own business. So that doesn't also strike me as somebody who's necessarily afraid of their neighbor. I mean, she didn't run away and scurry and hide. I mean, she looked him in the face or, well, looked, you know, directed a response and said, mind your own business. And I think that – What else did he admit to? Because in the question I have for you, at what point did he admit to these things and at what point up until the time he admitted, did he deny these things? At the trial? Prior to the trial, he denied everything, correct? Well, to whom? Prior to the trial. Were there any motions, any attempts to resolve the matters, anything to resolve and narrow the issues, and he denied everything? Well, his attorney filed what appeared to be like a response. It was contained like a general denial. Correct. Okay, because the sense I had when I was reading this was that, you know, I mean, I read the statute as well, and this statute reminds me a lot of the Illinois domestic violence act of 1986. In fact, in my mind, it almost mirrors it, except that it affords relief to a whole spectrum of individuals that don't have a familial or romantic-type relationship. It's kind of basically the same thing. And the sense that I got when I was reading the record was that, okay, so Mr. Acosta-Files is pleading, and as you may or may not be aware, most often those are expedited matters. And so you don't, and I don't want to say that it's statutorily requisite, it's not, but people generally don't file written responses. Sometimes you do, but for the most part, they're more summary in nature or they're more expedited, so everybody just goes in and testifies, and then the court receives evidence. But it's not like a contract dispute or a personal injury case where, you know, you have a lot of time for discovery. But at some point, did your client's lawyer at that time file a denial of all the allegations? Ultimately, he did. Ultimately, his attorney filed something, a general denial, basically because Mr. Acosta kept bringing up this procedural problem that he was having with no written response. So then when they went to hearing, your client admitted, correct? When they went to hearing, my client did. He admitted to certain things, not all, but obviously the certain things that you saw that he admitted to in the record and I referenced in my brief, yes. So he did. Why would sanctions not be proper for your client misleading the court and misleading the petitioner here, and perhaps and possibly narrowing the issues at the hearing? Well, first of all, I don't think sanctions would be appropriate because his conduct wasn't found to rise to the level of stalking. And I understand that he didn't admit to it. His attorney just filed a general denial, and he was relying on his attorney, so, you know, that his attorney knew what he was doing and just filed this general denial to get the case moving and forward. But I don't believe, based on my reading of the record, that that would have shortened anything, based upon the number of incidents that he had his clients testify to. Even if you take out the four, even if my client admitted, they would have still been there for days anyway. I think, Justice Shastrick, two different questions, not just the stalking element but the violation of the court's quote-unquote mutual no-contact order, which he admitted he violated. That's a separate question from the stalking question. So why shouldn't there be sanctions for that behavior? Okay, so you're asking me why there shouldn't be sanctions for his violations? Are you speaking to the rule? Well, for her ultimate ruling, he admits that he had contact, which would be in violation of the mutual order by the court, correct? Yeah, he admitted that he may have called her client a name after the entry of the order. He didn't admit to the other allegations that Mr. Acosta accused him of, like calling his client, pardon my French, a fucking whore. That was the trigger for that particular. That may go to the ultimate punishment, but if he admits he violated the order, why shouldn't the court have punished him for contempt? Because it's, well, why did he violate the order? It's like, I mean, any time that there is a violation of a court's order, it doesn't necessarily mean that it's because the parties don't respect you or care about the order, but you have to look to why. I mean, that's the same reason when you're dealing with contempt. My background is family law, but, I mean, if somebody doesn't pay their child support, if the guy's broke, you look to why. If the guy went to Vegas with the money, well, then that's contemptuous. And sometimes you don't get contempt even if that does happen, but that's a whole other argument. How do you see the trial court's ruling on that issue? I mean, did the trial court find him not guilty of criminal contempt? I don't think the trial court got there. I think the trial, because I think she started to say, okay, he made one admission. Mr. Acosta pressed him, if you noticed, at the end of the record. Did you, I can't remember what name it was, and then he said, maybe perhaps I did equivocate it, and then Mr. Acosta said, I need a yes or a no, and my client just said yes. That was really the only admission to the violation of her mutual and reciprocal no-contact order that my client made. The other facts were denied. So when the trial court was issuing her ruling on that issue, she acknowledged that he did technically violate her mutual no-contact order immediately. But then she, as I recall, but then she did stop herself, as Mr. Acosta pointed out, because, you know, she raised the issue of the fact that she had never discussed with my client his Fifth Amendment right not to incriminate himself, because he was dealing with, at that point, she was also, before her was, the issue of contempt, indirect criminal contempt, really, which would result or could result in incarceration. Was that issue properly before the court at the time that your client made those admissions? You know, that's an interesting question, Your Honor, because he actually filed his petition for rule to show cause on an order that was entered, an interim order, technically, that would have been extinguished had he had let her rule. Okay? So he files his petition for rule to show cause and says, well, Your Honor, before you rule, you've got to hear this. So I suppose, arguably, it would have been properly before the court to do it prior to her ruling. It was after the hearing. Well, it was kind of at the, yeah, she was, she had ruled, though. I don't know that they rusted either, but she had, if she had an issue of a ruling, I don't recall if they rusted, to be honest, but she had not ruled, so technically there was no order entered, so it didn't merge with the order. So it was, and he had brought it, I guess. So when your client made these admissions, are you conceding that he had notice of the indirect criminal contempt pending? When he had, he went. When he made the admissions, and Mr. Cost asked him these two questions that are cited in the rule to show cause, and it was two separate occasions. He admitted on more than one occasion. After May 22nd, he had flipped her the bird and called her a loser or something to that effect. So when your client made those admissions under oath during the hearing, was he properly, did he, did he prior to that receive proper notice to satisfy due process that these things were pending, that this issue was pending, that he was potentially subjecting himself to indirect criminal contempt? I don't believe that he understood that, and I, and also as I recall, the rule did not issue to shift the burden to him either. Again. I understand. It's not a burden shifting situation. That's indirect civil contempt where you issue a rule, the burden shifts to, the burden never shifts here. The burden is on the petitioner to prove beyond a reasonable doubt criminal contempt. The burden stays with the petitioner if it's a criminal contempt situation. Now, granted, there's some confusion because it was captioned a rule to show cause, but in the body of it, and again, we're supposed to look to the body, not the caption, the body, Mr. Costa, specifically asked for them to be held in indirect criminal contempt. So there was never any burden shifting. Okay. Mr. Elam was confused about that too, and there was no burden shifting. The rule had an issue because a rule wouldn't issue in this situation. Right. So under those circumstances, and I think, as you admitted, Mr. Elam was confused about that, I believe, and because he framed it as a petition for rule to show cause, he brought it, it appeared to be a rule to show, even when I, until you just pointed out the distinction, I mean, that's the way I was looking at it too, I would have to say then no, he did not understand adequately. He did not have adequate notice. Let me ask you this. If we find that the trial court was incorrect in finding that she failed to admonish him with respect to the contempt, if we find that she was in error and we reverse it and remand it, what would we be remanding it for? For a full hearing? For a ruling? What would happen upon remand? To me, you would have to remand it to me just for a ruling because she's already received all this evidence. So you can't have a second bite of the apple. You can't, I mean, they would have to rehear the whole thing. Would you agree with the general principle that if the underlying order is an invalid order that you can't be held in contempt? Well, I would agree with that, but it's still an order. It's an order. It's still an order. And even if the court was in error, then violation of that order is subject to contempt. Well, I suppose that's an interesting question, but it's still an order. Would there be a difference between a void order and a voidable order? Well, an order that's voidable is an order that I guess could have been entered but shouldn't have been. But a void order is an order that she just didn't have authority to order. And the mutual, because the statute specifically says you can't have mutual no-contact orders, and she enters this mutual stay-away order, and I think she did that just the sense that I got, is that she did it simply to basically appease Mr. Acosta's client. And perhaps she did it because she was just as frustrated with two grown adults behaving badly as most people in the court system may be. And maybe that's why she did it. And I'm not making any judgment, and I'm not saying how I'm going to rule, but sometimes sitting as a judge, when you see people coming before you behaving the way they are behaving, it can be sometimes frustrating that perhaps she didn't do it to appease Mr. Acosta's client, but perhaps she did it to bring some peace to his neighborhood. And I agree. And that was the, when I was reading this record, the sense that I was getting as I was reading it, and having, you know, in my past experience, which is very limited, is sometimes, you know, the courts are trying to tell you something. You know, and you always, you know, and you have to, as an attorney, sometimes you have to be able to see that. And I think by entering that order, I mean, I think she believed the court that this was going to ultimately settle. I think, and she was trying to, I think, let Mr. Acosta know these are proceedings that are to be expedited. And then they ended up having a pretrial where she, where she, the both parties basically got a chance to just informally argue. The same thing they argued through the days of the hearing, and she even said it in the end. She even said it in her ruling. She said, you know, the evidence played out exactly the way we talked about in the pretrial. And I ruled exactly the same way I told you I was going to rule in the pretrial. So I do, to your point, I do agree. I think that, but she did, she had to give more days, days for it, and she did. She didn't have a choice but to sit and listen to the evidence that she already knew was going to come out the way it came out and that she already believed that it didn't violate the work or the act. And you do divorce work a lot? I did. I don't do any. So sometimes you know that sometimes a client, it's difficult to control a client, or difficult to convince them or for the judge to convince them of something. And what do you do in those cases? You have no choice but to proceed because you just don't, you don't have any choice but to proceed. So, but that's the sense, the general sense that I took from this entire record. And Mr. Acosta, I think, did a phenomenal job. You can tell he's a very seasoned trial attorney. I don't think family law or the Illinois Domestic Violence Act is what he, the area he practices in. But he looked at his statute and he said, I need this, this, this, this to prove this. And he did exactly that. He had enough evidence and testimony, but you still have to look at the evidence and you still have to weigh the sufficiency of the evidence and you still have to look at the witnesses and you still have to balance all that. And that's exactly what the trial court did. I don't believe she did anything wrong. I don't believe that her order was incorrect. How about his issue on fees? Well, I understand that he'd like to get attorney's fees, wouldn't every client, but the fact of the matter is you have to have a finding that your client is a victim of the Stalking Act in order to get the fees. There's really no way around it. That's what the statute says. And he's reminding us constantly that this is what the statute says and this is what I did and so I should have gotten my relief and you shouldn't pay any attention to the conduct of my client. I mean, his client essentially violates the Act in order to gather evidence to have my client prosecuted for violating the Act. That's the long and short of it to me. And you read everything. I mean, his client is just as wrong. I mean, who surveils somebody's home 24 hours a day, 7 days a week? I mean, how? It's permissible to the security. I understand. It's a security camera. And there's also, as the trial court found, both parties have First Amendment rights to freely express themselves. They do. And so unfortunately, you know, for certain people, I mean, you do have the First Amendment rights to call someone an asshole. You do. It's not a nice thing to say. It's not, but you do. And that's what my client is really, he's just being charged with. He's being basically accused of being rude. He never said anything like, I'm going to burn your house down, I'm going to beat you up, I'm going to. There were no threats like that, right? No, there were no threats like that. Probably the worst thing that Mr. Acosta could raise would be that newspaper article. It was a newspaper article about mental health. And he was just trying to help them out, wasn't he? Well, that's what he testified to, yeah. Or perhaps, or perhaps it's, look, you're videotaping me and you're following me around and there's something wrong with you. So I don't know. I mean, but the testimony is that, yeah, he was just trying to help them out. But he underlined certain, you know, phrases in the article, but he never threatened or overtly raised a fist at or threatened anything. He never did anything other than just act poorly. Thank you, Ms. Rosa. Mr. Acosta, what do I get? Thank you. I just want to address a few of these points more specifically, if I could. Starting with the last issue, Justice Burkett talked about threatening language. In one of the video segments that we presented to the trial court and to the public court is where there is a confrontation at the mailbox. And Mr. Fritchie says, first he spits in the direction of the plaintiff or onto the mailbox. He denied it was on the mailbox, but he admitted spitting. And he said, happy loser, are you going to grow some balls someday and become a man? Very intimidating speech. It's not overtly threatening harm, but it's challenging in a physical, intimidating way. And your client was videotaping that. He was. He was, Justice. Chased him, or not chased him, but ran down to the mailbox in order to capture the respondent's words on tape. I think if you watch the video, there is absolutely no suggestion of running. He gets out of his car, the camera is in his hand, and the video is going all over the place. That's what I mean. But he's not running. Well, rushing, whatever term you want to use. There was evidence that the respondent would often shy away from the cameras while making intimidating comments and vulgar comments. And with respect to that, you know, in terms of whether or not your client or his wife suffered severe emotional distress, the trial court made a specific finding. If you're afraid, if you're harassed so much, why did you go to the mailbox? I'm glad you raised that. One of my points was to say that it doesn't have to be the petitioner himself that he fears harm for himself. The petitioner is also bringing this petition on behalf of his wife and his child, and he has reason to be concerned about the safety of his wife and the safety of his child based on this respondent's conduct. So even though he may personally want to stand up to him physically, that's not the same concern that's addressed in the statute with regard to the family. So that's an independent basis that this petition can be brought solely on behalf of those members. And they're listed in the petition. And the wife testified she was afraid. Absolutely. She was afraid. They changed the conduct of how they use their front yard. They go in the back yard. They avoid when he's out in his front yard, they avoid going out in the driveway. There's repeated testimony about how the son demonstrated fear, wouldn't want to go outside. This is a chilling effect on the way that these people live. Respondent testified that there were many times that he would go out of his house and he would make sure they were not out, and he would start his yard work, and then they'd come rushing out into the front yard. They, the entire family, would come rushing out into the front yard. And that's in the record, and the trial court certainly could have considered that. Certainly. I suppose I revert to the original argument that we made about an independent basis for his own. If he felt that there was grounds for a petition on his own, he could. But that's what the respondent testified to. You're right. No, but I'm talking about their emotional distress. I mean, if they see him out, this person that they fear so greatly out in his yard, I mean, there would be no way they would all come rushing out to the yard. In fact, that's diametrically opposed to what they actually testified to was when they saw him, they tried to avoid him, they being the wife and the child. So I'm just saying that there's evidence in the record that tends to contradict your argument regarding emotional distress as it relates to the wife and child. Well, I would concede that the respondent made some isolated comments to that effect, whether the court wanted to undo everything that the wife and child had testified about because of an isolated incident that the respondent said they came rushing out. Well, he mentioned it happened often. He didn't say it happened in one time or an isolated incident. And now we're talking about a factual allegation that we have to reverse, you know, give the trial court the benefit of the doubt unless we find it's against the manifest weight of the evidence. So if we find, if we see that the trial court in some way, based on its ruling or, you know, there's evidence in the record to support the fact that there wasn't this emotional distress on behalf of the entire family, I mean, it's very difficult to reverse on that basis when we're talking about the standard review. The testimony of the mother, Christine, and Gregory Jr., as far as their mental state, as far as their emotional state, is really unrebutted by, even by an instance of witnessing them coming out in the front yard. I don't think that, from a legal standard, undoes what they testified to is going on in their mind and how they feel apprehensive. Well, wait a minute. So you're saying that if somebody testifies to what's going on in their mind, then you don't look at the strong circumstances. That is the be-all, end-all of the entire argument. And if that's the case, then nobody gets convicted of theft because they never intended to, you know, they just come into court and say, I swear I never intended to permanently deprive that person of this thing. And then the trial court would just have to say, well, you said it, nobody rebutted it, but you look at the surrounding circumstances. And here we have other testimony as to the surrounding circumstances that would rebut that testimony. I don't think that the testimony of the respondent rebutted anything. These people have to come out of their home occasionally. They have to get in their cars. They have to go out. They did that. What he testified to about them coming out has no rebuttal value to that. If I could address just one or two more points. I'll give you one more point. Thank you. Justice Shostak was asking questions about the answer that was found, the verified answer. In the appendix at pages- A61. A61. This is a signed, verified, pleading answer by the respondent himself, not merely by the attorney. Thank you. We'd like to thank the attorneys for their argument today, and we'll take the case under advisement. Thank you very much.